**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CLETTER DUPREE; ANTHONY MINES, ROBIN MCDANIELS, on behalf of herself and as Mother and Next Friend of S.B. and L.M.; TISHA DUPREE; WANDA DUPREE; and XAVIER DUPREE, as Father and next Friend of X.D., A.D. and A.R., | ) ) ) ) ) ) ) ) | No. 18-CV-08304 Judge John J. Tharp, Jr. |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| THE VILLAGE OF BELLWOOD; and OFFICERS WOODS-ORTIZ; TREVARTHEN; MICHELLI; and OTHER UNKNOWN OFFICERS. | ) ) ) ) ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On the evening November 21, 2018, the defendant police officers were pursuing a speeding motorist who refused to pull over and led them on a vehicular chase. When the motorist got out of his car and fled into an apartment building, the police followed. In search of the suspect, and without a warrant, the police kicked down the plaintiffs' door and charged in, guns drawn and shouting. But the suspect wasn't there, and the police admit he never was. The plaintiffs (hereinafter collectively referred to as "the Duprees") brought this action under section 1983 claiming violations of their Fourth Amendment rights to be secure from unlawful searches and seizures. The police argue that they didn't need a warrant because they were in hot pursuit of a fleeing felon. Because the officers are alternatively entitled to qualified immunity or because no jury could find that their conduct was objectively unreasonable, their motion for summary judgment is granted in its entirety.

## BACKGROUND

The evening before Thanksgiving in 2018, Cletter Dupree had invited several members of her family to her garden apartment at 4402 St. Charles Rd in Bellwood. Def.'s Statement of Material Facts (DSMF) ¶¶ 1-2, ECF No. 33. She was joined by her daughters Wanda and Tisha, Tisha's significant other Anthony Mines, granddaughter Robin McDaniels, and five great-grandchildren, ages 2, 3, 5, 9, and 15.. Pl.'s Additional Material Facts ¶¶ 2-5, ECF No. 45. At one point in the evening, Cletter stepped out of her apartment and walked to her son's apartment located "across the yard." At about the same time, Anthony Mines went to take out the trash. DSMF ¶ 3.

Meanwhile, elsewhere in Bellwood, Officer James Michelli observed Eric Terrell driving a car that was speeding and "initiated a traffic stop." Pl.'s Resp. to DSMF ¶ 8. But Terrel did not pull over. According to recorded dispatch radio, he led the police on a chase ranging from 30-55 miles per hour for the next four minutes, in zones with speed limits between 15 and 30 miles per hour, including a school zone, ignoring stop signs along the way. Pl.'s Resp. to DSMF ¶¶ 11-12; Dispatch audio at 2:33-6:30, Ex. G to DSMF.[1] At some point during the pursuit, Master Sergeant Trevarthen and Officer Woods-Ortiz joined Officer Michelli in pursuit of Terrel, with Trevarthen eventually becoming the lead vehicle. Pl.'s Resp. to DSMF ¶¶ 9-10, 16. After several minutes of

---

[1] In their briefing, the defendants characterize this as a high-speed chase (and thus an emergency that justifies their entry into the Duprees' apartment without a warrant). Def.'s MSJ at 10. The plaintiffs respond that the dispatch audio recording indicates this was a low-speed chase, but they do not point to a particular timestamp in the recording for that proposition, and in reviewing the dispatch recording the Court could not hear any of the officers or the dispatcher referring to this as a low-speed chase. Resp. at 7, ECF No. 46. The audio recording features an officer (presumably Michelli) reporting his location and speed to the dispatcher as he pursues Terrel, interspersed with other officers' reports to dispatch. The Duprees admit that the dispatch audio says what it says, and though they dispute Terrel's speeds (and presumably that he ran stop signs while fleeing) they have adduced no evidence that the car chase happened other than described by the police.

this, Terrel stopped outside the apartment complex at 4402 St. Charles St.—the building in which the Duprees live—got out of the car and ran inside.[2] *Id.* at ¶¶ 18-20. At this point, Trevarthen was the closest in pursuit and was the first to chase Terrel on foot when Terrel got out of his car. By the time Trevarthen was able to get out of his squad car, Terrel had already entered the apartment building. *Id.* at ¶ 19. Trevarthen says he was "less than ten seconds" behind Terrel.[3] Trervarthen Decl. ¶ 8, Feb. 27, 2017, ECF No. 33-11.

Officer Woods-Ortiz arrived moments later and parked his car in the alley near the building. *Id.* at ¶ 22. As he ran toward the entrance, he came across Anthony Mines taking out the trash and yelled at him to get down on the ground while pointing his weapon at him. Pl.'s Resp. to DSMF ¶¶ 23-29; Woods-Ortiz body camera video, 03:27-03:40.[4] Mines complied, and satisfied that he was not the fleeing suspect, Woods-Ortiz continued into 4402 St. Charles Road, entering just behind Trevarthen.[5]

---

[2] As far as the Court can tell from the body camera footage, the apartment complex at 4402 St. Charles St. in Bellwood is one building with two or three different entrances to different wings. A resident can only access another wing by going through the exterior front door of that wing. Each wing appears to contain four units and a laundry room. Cletter and Wanda Dupree live in the same building as Anthony Mines, but he is in a different wing. The Duprees live in the same wing where Terrel was ultimately arrested; his apartment is one floor above theirs.

[3] The parties dispute how closely Trevarthen was pursuing Terrel. Pl.'s Additional Statement of Facts (PSMF) ¶¶ 9-10, ECF no. 45. The plaintiffs do not dispute the particulars of Trevarthen's account, but infer that he was not close behind the suspect by referencing a statement Trevarthen made several minutes after the entry into the Duprees' apartment building. Trevarthen told another officer that as soon as he entered 4402 St. Charles St., the Terrel was "gone." PSMF ¶ 9.

[4] The plaintiffs dispute the defendant's presentation of some of the details of this interaction between Woods-Ortiz and Mines—for example, whether Woods-Ortiz pointed his weapon at Mines or just held the weapon at the "low ready" position. The body camera footage does not resolve these disputes. It is difficult, for example, to tell exactly how Woods-Ortiz was holding his weapon, or what the officer could see. Accordingly, the Court presents these facts in the light most favorable to the non-movant.

[5] The parties do not dispute that Trevarthen entered the building and immediately made his way up the stairs, and that Officer Woods-Ortiz "simultaneously" entered. The Court understands

Once Woods-Ortiz entered the building, he saw Trevarthen standing on the stairs to his left. Woods-Ortiz body camera, 3:45. A few feet in front of Woods-Ortiz and down a small flight of stairs was the door to the Duprees' garden apartment. Both Trevarthen and Woods-Ortiz say they heard that door slam shut, Pl.'s Resp. to DSMF ¶¶ 32-37,[6] and Woods-Ortiz' body camera footage shows that within two seconds after entering the building, the door to the garden apartment closed. Woods-Ortiz body camera at 03:45-03:48. Immediately after the door closed, Woods-Ortiz exclaimed, "he went down this floor," announced "open the door, police!" and kicked in the door to the Duprees' apartment. *Id.* Woods-Ortiz remained at the threshold, weapon drawn, shouting "get down on the ground!" while Trevarthen entered the apartment with his weapon drawn, repeatedly demanding "where'd he go?" *Id.* He advanced into the apartment and performed a "protective sweep" of the premises. Woods-Ortiz body camera, 04:00-04:08. Instead of finding Terrel, the officers found the startled plaintiffs seated on the couch, including several scared and crying children.

The officers, alerted by that slamming door and thinking their suspect was inside, had entered the wrong apartment. It was Wanda Dupree, not Terrel, who had slammed the door to the apartment. After Trevarthen entered the apartment building in pursuit of Terrel, the commotion

---

that Woods-Ortiz entered just after Trevarthen, and that the former's entry was simultaneous with the latter's proceeding up the stairs. This is borne out by Woods-Ortiz's body camera footage, which does not show the two officers entering the building at precisely the same time; but the viewer can see that Trevarthen is standing a short distance from the entrance on the stairwell at the moment Woods-Ortiz enters.

[6] The plaintiffs indicate that they dispute that Trevarthen and Woods-Ortiz both heard the door slam, but in doing so they cite to a paragraph in their additional statement of facts that has nothing to do with this "disputed" fact. Pl.'s Resp. to DSMF ¶ 33 (citing PSOAF ¶ 14, which contends that "Defendant Woods-Ortiz immediately drew his gun as soon as he exited his car."). Elsewhere, the plaintiffs admit that Woods-Ortiz heard the door slam upon his entry into the building. Pl.'s Resp. to DSMF ¶ 37.

outside her apartment piqued her curiosity and she cracked the door open. Upon seeing armed police on the stairs, she closed it "in a hurry." Pl.'s Resp. to DSMF ¶¶ 5-6, ECF No. 44.

Cletter Dupree, who had not been in the apartment when the police entered, returned while officers were still in the apartment. The officers asked Cletter if they could search the apartment; she responded that "she didn't care," and the officers proceeded to search the bedrooms and bathroom. Pl.'s Resp. to DSMF ¶¶ 58-59.[7] She also gave the officers her laundry room key; the officers searched there too but did not find Terrel. Pl.'s Resp. to DSMF ¶¶ 62-64

Eventually, the officers determined that Terrel resided in one of the upstairs apartments. The parties dispute how the police determined this, but the dispute is not material. The police knocked on the door of the unit and spoke with a woman inside, who consented to a search of her unit. They found Terrel inside and took him into custody. Def.'s Resp. to PSMF ¶¶ 32-73. Trevarthen was astonished when he learned that Terrel had fled because of a mere suspended license—a ticketable offense. Trevarthen body camera, 5:05-5:25. Later, Trevarthen went back to the Duprees' apartment, apologized, and assured them they would be compensated for their broken door. *Id.* at ¶ 40.

The Duprees filed this action in December 2018, bringing several claims. In Count I, they allege that the officers failed to knock and announce their entry, violating the plaintiffs' Fourth Amendment rights. In Count II, they allege an illegal search and seizure of the Duprees' apartment. In Count III, they allege that the officers used excessive force when they pointed weapons at the Duprees after forcibly entering the apartment, and against Anthony Mines when Officer Woods-

---

[7] There were thus two searches at issue—the initial protective sweep that occurred immediately after the officers kicked down the door, Woods-Ortiz Body Cam at y 3:30-3:45, and a second consent search about three minutes later, *Id.* at 7:20-8:15. The Duprees claim that both searches violated their Fourth Amendment rights.

Ortiz ran past him, pointing his weapon at him for a few seconds, and told him to get on the ground. Counts IV and V are state law claims for intentional infliction of emotional distress and for assault.

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the facts in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitution rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).[8] "It is the plaintiffs' burden to demonstrate that a constitutional right is clearly established." *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000). The qualified immunity inquiry "turns on the objective legal reasonableness of the action… in light of the legal rules that were clearly established" at the time. *Anderson v. Creighton*, 483 U.S. at 639.

---

[8] The parties articulate the test for qualified immunity, consistent with many pre-*Pearson* cases, as a two-step inquiry: first, ask whether the plaintiff has shown a violation of her constitutional rights; second, ask whether the official violated clearly established law. 555 U.S. at 232 (summarizing this outdated approach). As the discussion below shows, the Court finds there is a genuine dispute as to whether the officers had probable cause to believe that Terrel was in the Duprees' apartment—because it is disputed how closely behind they were pursuing him, and thus, whether they were justified in believing that he was in the Duprees' apartment. Thus, the Court cannot answer whether there was a constitutional violation without resolving this material fact dispute. In any event, the Court concludes that the officers did not violate clearly established law. In *Pearson*, the Supreme Court held that courts need not follow this two-step "rigid order of battle." Going directly to the question of whether the law was clearly established will often save judicial resources, and there are often cases (like this one) where "the Fourth Amendment inquiry involves a reasonableness question which is highly idiosyncratic and heavily dependent on the facts." 555 U.S. at 237 (quoting *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir. 2006)).

The defendants have moved for summary judgment as to all of the Duprees' claims. They contend that, because they were pursuing a suspect, they were entitled to make a warrantless entry to catch him, and thus they did not violate the Duprees' constitutional rights. Even if they did, they maintain that they are entitled to qualified immunity because none of their actions violated clearly established law. The plaintiffs respond that the pursuit of Terrel for a traffic violation did not give rise to exigent circumstances, so their forced entry and later search of the Duprees' apartment was unlawful. They further contend that a slamming door cannot be grounds for the police invade someone's home when in pursuit of a suspect. The police violated clearly established law, the Duprees argue, by entering their apartment without a warrant.

First, the Court takes up the parties' arguments regarding the forcible entry into the Duprees' apartment. The Court concludes that the police were in hot pursuit of Terrel, and thus could effect a warrantless entry to locate him, but they still needed probable cause to believe that Terrel was in the Duprees' apartment. Officers Trevarthen and Woods-Ortiz are entitled to qualified immunity with respect to their judgment that they had probable cause to enter. The Court also concludes that the officers did not use excessive force by raising their weapons after entering the apartment. Next, the Court finds that there is no genuine dispute that Cletter Dupree consented to the search of her apartment that occurred several minutes after the initial forcible entry. The Court also grants summary judgment denying Anthony Mines' claim that he was unlawfully seized and that Woods-Ortiz used excessive force against him. Finally, the Court grants summary judgment as to the claims against Officer Michelli because he was either not involved in the searches and seizures that form the basis of the plaintiff's claims, or because he, too, is immune from suit.

I.  **The Officers were in hot pursuit of a fleeing suspect, but there is a fact dispute as to whether they had probable cause to believe he was in the Duprees' apartment.**

The defendants argue that exigent circumstances excuse Officers Trevarthen's and Woods-Ortiz's warrantless entry into the Duprees' apartment. Def.'s MSJ at 12-14, ECF No. 32. The officers were in hot pursuit of a fleeing suspect and had a "reasonable articulable suspicion" that the suspect was in the Duprees' apartment because the Duprees' door was slammed shut within seconds of the suspect entering the apartment building. *Id.* at 13.

The Duprees respond, first, that the offense for which the officers were pursuing Terrel was too minor to justify an exception to the warrant requirement. Second, they argue that the officers' pursuit of Terrel had cooled by the time they heard the Duprees' door slam. They point out that the officers, by their own admission, had lost sight of Terrel by the time they entered 4402 St. Charles Road after the suspect. In the Court's view, the officers were in hot pursuit and thus did not need a warrant to enter a residence and apprehend Terrel, but that does not tell the whole story—they still needed probable cause to believe Terrel was in the Duprees' unit for their entry to be lawful.

A.  **Terrel's conduct gave rise to exigent circumstances**

The Fourth Amendment "generally requires the obtaining of a judicial warrant" before law enforcement officers can enter a residence. *Riley v. California*, 573 U.S. 373, 382 (2014). Exigent circumstances, however, can justify a departure from the warrant requirement where the delay in waiting for a warrant would have "real immediate and serious consequences[.]" *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984). Accordingly, courts have recognized that officers may enter a residence without a warrant in various situations, such as "to render emergency assistance" to occupants, *Riley*, 573 U.S. at 388, or to pursue a fleeing suspect. *See U.S. v. Santana*, 427 U.S. 38, 393-94 (1978). The exigency presented by a pursuit, such as whether the suspected underlying

offense is grave enough to trigger the exception, depends on "the totality of the circumstances confronting the officer as he decides to make a warrantless entry." *Lange v. California*, 141 S. Ct. 2011, 2018 (2021). Of course, the presence of exigent circumstances does not authorize indiscriminate entry into any residence in a multi-unit apartment building. *See Jacobs v. City of Chicago*, 215 F.3d 758, 769-70 (7th Cir. 2000). Law enforcement must also have "probable cause that the occupant is the suspect." *Mason v. Godinez*, 47 F.3d 852, 855 (7th Cir. 1995).

The Duprees' argument that Terrel's conduct did not give rise to exigent circumstances is unconvincing. The officers argue persuasively that, while Terrel may have been pulled over for a minor offense, the situation changed when he decided to flee from that minor stop in his car. Under the Illinois Criminal code, when Terrel led the police on a vehicular chase, he committed the fourth-degree felony of "aggravated fleeing or attempting to elude a police officer," 625 ILCS 5/11-204.1. That Illinois treats fleeing in a vehicle as a felony seems to settle this issue—the rule is often formulated as an exception that applies when the police are in pursuit of a "fleeing felon," which the police had good reason to believe Terrel was. *Santana*, 427 U.S. at 42-43.[9] Debate on the hot pursuit exception is typically confined to the types of ***misdemeanors*** that give rise to exigent circumstances. *See Stanton v. Sims*, 571 U.S. 3, 10 (2013) (holding that officer defendants were entitled to qualified immunity because "the law regarding warrantless entry in hot pursuit of a fleeing misdemeanant is not clearly established."). Nonetheless, applying a categorical rule here requires some caution where the felonious conduct relied upon by the officers to justify a warrantless entry is the flight itself (from a ticketable traffic offense), rather than, as in the key

---

[9] The Duprees suggest that the offense cannot have been so grave because the state ultimately declined to prosecute Terrel. Pl.'s Resp. to DSMF ¶¶ 11-12. But a prosecutor's decision to drop charges may be based on any number of factors other than the seriousness of the offense, including the prosecution's workload and other enforcement priorities.

Supreme Court precedents, an underlying felony or misdemeanor. It cannot be that states can create an exception to the warrant requirement by designating any flight from an officer as a felony. Instead of applying a categorical rule, the Supreme Court instructs courts to approach this exception on a "case-by-case basis" with sensitivity to "the facts on the ground." *See Lange*, 141 S. Ct. at 2019.

The Duprees concede that leading the police on a car chase "is bad" but maintain that it "is not deadly or imminent" [*sic*]. They also characterize the chase, without citation to the record, as "low-speed." The dispatch audio in the record shows there is a kernel of truth to this; Terrel's flight was hardly a scene out of *The Fast and the Furious*.[10] But neither was Terrel merely "attempting to pass his driving test." *Cf. Scott v. Harris*, 550 U.S. 372, 378-79 (2007). Though his speeds weren't extreme in absolute terms, he did significantly exceed the speed limit, at one point driving 55 miles per hour through a school zone with a posted speed limit of 30 miles per hour, ignoring stop signs all the while.[11] It is reasonable for an officer to suspect that someone who evades a

---

[10] Universal Pictures, 2001.

[11] The plaintiffs dispute "in part" the defendants' factual assertions regarding Terrel's speeds during the vehicular chase. Pl.'s Resp. to DSMF ¶¶ 11-12. The dispute boils down to the Duprees' contention that there is "no objective evidence that these offenses occurred," only "after-the-fact police reports." *Id.* at ¶ 12. But there is evidence that the car chase happened as described, in addition to the police report and the officers' affidavits, most notably a contemporaneous dispatch recording in which an officer relayed Terrel's speeds in real time. Dispatch Audio 2:33-6:29, Ex. G to DSMF. This is consistent with the defendants' other submissions. The Duprees' point about the nature of the evidence might be a strong one if this were a criminal matter and Terrel were the defendant, but the standard of proof and allocation of burdens on summary judgment in a civil matter are different. Where "the nonmoving party will bear the burden of proof at trial on a dispositive issue"—which is true here, because the plaintiff would have to prove by a preponderance of the evidence that the officers violated the Duprees' constitutional rights because they were not in hot pursuit of a fleeing felon—Rule 56 requires "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file" show that there is a genuine dispute of material fact. *Celotex Corp. v. Cattret*, 477 U.S. 317, 324 (1986) (internal quotation marks and citations omitted); see also *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) (qualified immunity is an affirmative defense, but once raised, it is the plaintiff's burden to defeat it). The Duprees have responded to the defendants'

routine traffic stop by leading the police on an extended car chase—thus showing a willingness to take on extraordinary risk to himself, the police, and innocent bystanders—may resort to other desperate measures, and thus represents an acute danger to public safety. Among other things, the police expressed a fear that a fleeing suspect could take hostages. Woods-Ortiz Decl. ¶ 17, ECF No. 33-10. The police, it is fair to say, had no idea why Terrel was fleeing; given Terrel's extreme reaction to a traffic stop, they had good reason to think he had done something far more serious than commit a traffic infraction. *See* Trevarthen body camera, Ex. 6 to Pl.'s Resp. to DSMF, 14:30-14:55 (Trevarthen, astonished upon learning from Terrel that he fled because of a suspended license, exclaimed "all that for this?"). When a routine traffic stop turns into a car chase, the police are not required to determine precisely why the driver is behaving so recklessly before acting expeditiously to arrest him.

To the extent there is any doubt that leading the police on a car chase gives rise to exigent circumstances, given the lack of clearly established law as to which ***misdemeanor*** offense can give rise to exigent circumstances, the officers are alternatively entitled to qualified immunity for their legal judgment that Terrel's felony conduct—fleeing in a vehicle—gave rise to exigent circumstances. *Stanton*, 571 U.S at 6, 10 ("the law regarding warrantless entry in hot pursuit of a fleeing misdemeanant is not clearly established.").

### B.      The officers were in "immediate and continuous pursuit" of Terrel

The other piece of the "hot pursuit" exception is that the pursuit must be "immediate or continuous[.]" *Welsh*, 466 U.S. at 753. The Duprees argue that the officers' pursuit of Terrel had

---

characterization of the car chase by arguing that the defendants' account cannot be credited, but they have not explained why, nor adduced any evidence that would show the car chase happened other than as described by the police. Thus, the defendants' factual assertions about Terrel's speeds in the car chase stand unrefuted.

cooled by the time Trevarthen had entered the apartment building. In response, the defendants aver that Trevarthen was hot on his heels, "less than ten seconds" behind Terrel when Trevarthen saw him enter the apartment building. 571 U.S. 3 (2013). The Duprees dispute this by pointing to Trevarthen's statement that he was putting his squad car in park at the same time Terrel was entering the building, implying that more time elapsed between when Terrel entered the building and when Trevarthen entered behind him. Pl.'s Resp. to DSMF ¶ 9. Moreover, the Duprees seize on statements by Trevarthen, recorded by his body camera shortly after the forcible entry into the Duprees' apartment: "I was right behind him outside and as soon as I got inside he was gone." Def.'s Resp. to PSMF ¶ 10, ECF No. 53. This, they contend, means the officers did not have a justification to enter Duprees' apartment—the Duprees' slamming door indicated that someone was inside the apartment, but given that Terrel was "gone," did not provide a basis for believing that that someone was Terrel.

Thus, according to the Duprees, "immediate or continuous" means an officer must have his eyes on the offender at every moment in order to claim an exception to the warrant requirement based on exigent circumstances. Supreme Court and Seventh Circuit precedents, however, are not so demanding.[12] An emergency justifying a warrantless entry can arise where law enforcement lost sight of the suspect for some time, or after even after never having eyes on the suspect at all. In *Warden v. Hayden*, for example, the Supreme Court concluded that the hot pursuit exception

---

[12] The plaintiffs' take on the hot pursuit exception resembles one that has been expressly rejected by the Supreme Court. In *Anderson v. Creighton,* 483 U.S. 635, 644-45 (1987), the Court declined "to make an exception to the general rule of qualified immunity for cases involving allegedly unlawful warrantless searches of innocent third parties' homes in search of fugitives and in doing so expressly rejected an argument based on English common law, which held that a peace officer searching for a suspect in a residence could be held strictly liable if the suspect was not inside.

applied when "[t]he police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before." 387 U.S. 294, 298-99 (1967).

The Seventh Circuit has held that the exigent circumstances exception applies in similar scenarios. In *Llaguno v. Mingey*, for example, the police raided the house of a suspect's mother based on the address registered to a car the suspect crashed while fleeing; they did not follow him to the house (as happened in *Santana* and *Stanton*), but went there because the car had not been reported stolen, raising the inference that it belonged to a family member, and because "fleeing felons often return home." 763 F.2d 1560, 1563 (7th Cir. 1985) (abrogated on other grounds by *Graham v. Connor*, 490 U.S. 386, 397 (1989)). The circumstances were clearly an emergency— the person fleeing was suspected of having recently committed homicides, and the police feared he might commit more. *Id.* at 1565. Waiting to obtain a warrant could have put the public at greater risk. But the Seventh Circuit's analysis did not end with its conclusion that this was an emergency situation—the officers still needed probable cause to believe that the suspect was in the particular house that they ultimately raided (and where the suspect was not found). *Id.* at 1564. The Court held that whether there was probable cause to enter the house was one for the jury; that aspect of *Llaguno* has since been abrogated. *See Bell v. Irwin*, 321 F.3d 637, 641 (7th Cir. 2003) (recognizing that *Llaguno* "has been superseded by *Graham* and *Ornelas*, which stress that reasonableness is analyzed objectively, and as a matter of law. Judges rather than juries determine what limits the Constitution places on official conduct.").

The Seventh Circuit performed the same analysis in *Mason v. Godinez*, where it explained that "the commission of a serious felony alone does not justify a warrantless entry into a person's home without probable cause that the occupant is the suspect." 47 F.3d 852, 855 (7th Cir. 1995). In *Mason*, witnesses pursued a suspect fleeing the scene of an armed robbery. The witnesses

followed the suspect to his house and saw him enter, and then, minutes later, saw a person dressed differently leave the house and drive off. *Id.* at 854. Acting on this information provided by the witnesses (but without having laid eyes on the suspect themselves) the police entered the house without a warrant and found evidence of the robbery. *Id.* The court held that the police did not need a warrant because of the exigency of this situation, and separately analyzed whether the police had probable cause to search the residence, ultimately concluding that whether they did was "arguable." *Id.* at 856. Because this was a petition for habeas corpus and the Fourth amendment claim was raised in the context of the petitioner's counsel's claimed ineffectiveness for failing to move to suppress the evidence found within the home, the deferential standard from *Strickland v. Washington*, 466 U.S. 668 (1984) meant that an "arguable" lack of probable cause was insufficient to make out a claim for ineffective assistance of counsel.

That the police officers lost sight of Terrel therefore has some probative value, but it goes to whether the officers had probable cause to believe that Terrel was in the Duprees' apartment, not to whether the circumstances were exigent. They clearly were.[13] Terrel had just led the officers on a car chase through a residential area; the officers were justifiably concerned that he posed a threat to public safety. *Mason* and *Llaguno* teach that the question of whether the officers were in hot pursuit does not turn on whether the officers were ten seconds behind Terrel, or thirty seconds behind him—"immediate and continuous" pursuit does not necessarily mean the officers must see a suspect enter a home. Instead, the plaintiff's argument goes to whether the officers, based on hearing a door slamming while closely pursuing a suspect, had probable cause to believe that

---

[13] Even if there were "a legitimate question whether an exception to the warrant requirement exists," then the officers would be entitled to qualified immunity on that question, because then "it cannot be said that a warrantless search violates clearly established law." *Mitchel v. Forsyth*, 472 U.S. 511, 535 n.12 (1985).

suspect was in the Duprees' apartment, and because that is a close question, the officers are entitled to qualified immunity.

## II.  Officers Trevarthen and Woods-Ortiz are entitled to Qualified Immunity as to the Duprees' claims related to the warrantless entry and pointing of weapons

Probable cause "means more than bare suspicion but less than absolute certainty that a search will be fruitful." *Mason*, 47 F.3d at 855. It "deals with probabilities and depends on the totality of the circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Where, as here, exigent circumstances are present, the existence of probable cause "var[ies] with both the need for prompt action and the quality of information available." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

### A.  Warrantless Entry

The Duprees argue that the slamming door heard and seen by the officers when they entered the building in pursuit of Terrel could not justify the invasion of their apartment. The closing door had no probative value as to the location of Terrel, they aver—he could have been anywhere in that building.

The Court does not agree that a door slamming in close proximity to officers in pursuit of a suspect has no probative value. The slamming door can indicate the presence of a fleeing suspect, but its probative value is a function of how closely the officers were pursuing. *See Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993) ("Probable cause is often a matter of degree, varying with both the need for prompt action and the quality of information available."). If the officers had been, say, two seconds behind Terrel, or "less than ten," as the defendants posit, then the slamming door has considerable probative value, especially if it was the first thing the officer observed upon entry to the building, as it was for Officer Woods-Ortiz. If the officers were one

minute, or five, behind the suspect, then a slamming door would probably say little, if anything, about the presence of a suspect in a particular unit of an apartment building.

The plaintiffs here do not say the officers were minutes behind Terrel; their dispute boils down to seconds. It's not clear exactly how many seconds are in dispute—the Duprees point to the defendants' admissions that Trevarthen was stepping out of his vehicle at the moment Terrel was entering the apartment building; the defendants do not dispute this but say that the gap between the two was one of mere seconds. Pl.'s Resp. to DSMF ¶¶ 18-19. This dispute cannot involve many seconds—at approximately the same time that Woods-Ortiz ordered him to get on the ground, Mines saw the suspect entering the building, meaning that Woods, the second officer to enter after Trevarthen, entered the building moments after Terrel.[14] Pl.'s Resp. to DSMF ¶¶ 77.

The plaintiffs do not identify any clearly established law that the officers violated. Instead, they say that the Supreme Court "has put beyond debate the question of whether officers can force their way into a home without consent," Pl.'s Resp. 11, arguing, reductively, that the officers violated the plaintiffs' Fourth Amendment rights. That argument is easily dispensed with—the Supreme Court has "extended qualified immunity to officials who were alleged to have violated the Fourth Amendment," *Anderson*, 483 U.S. at 643, and as the discussion so far makes clear, has recognized several scenarios where exigent circumstances justify an officers' entry into a home without consent or a warrant. Moreover, the Duprees argue at too high a level of generality. "[I]t

---

[14] In his deposition, Mines testified that while he was on the ground obeying Woods-Ortiz's command to get down, he saw "an African American male stop his truck in front of the building and run inside." Pl.'s Resp. to DSMF ¶ 77. In their response to the Defendant's LR 56.1 statement, however, the plaintiffs—including Mines—dispute the accuracy of Mines' deposition testimony by pointing to Woods-Ortiz's body camera footage, on which there is no sign of Terrel entering the building at the moment Mines describes. Regardless, there is no dispute that it was a matter of seconds between the entries of Terrell and the police and that the pursuing officers did not see Terrel when they entered the building.

simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment" that an officer's conduct in making a warrantless entry is "objectively legally unreasonable." *Id.* at 641. The Duprees have not come close to meeting their burden to show that the defendants violated clearly established law in entering the Dupree's apartment without a warrant.

Officers sometimes make mistakes; qualified immunity works to immunize them from damages suits arising from those mistakes so long as there is no transgression of clearly established law. If the officers made a mistaken legal judgment where precedents have created a gray zone, they are immune from suit; if they crossed a bright-line rule, they are not. And a review of Supreme Court precedents makes clear that we are not dealing with a bright-line rule, but rather one that "deals with probabilities and depends on the totality of the circumstance." *Wesby*, 138 S. Ct. at 586. There are no doubt cases where the police officer's assessment of probable cause is clearly outside this zone of lawfulness—the hypothetical discussed above is one example; had the officers entered the apartment building five minutes after Terrel and kicked down a door because it had closed, that would likely violate clearly established law. But in this case, the factual dispute underlying the reasonableness of the officers' judgment that they had probable cause comes down to the import of mere seconds; the miniscule range of that dispute means the officers were not dealing with legal certainties. In these circumstances, "the rules of qualified immunity require giving the benefit of the doubt to the reasonable public official if the particular case falls within that gray area." *Harnishfeger v. United States*, 943 F.3d 1105, 1120 (7th Cir. 2019).[15]

---

[15] The Seventh Circuit directed this statement specifically to legal rules that require a balancing test, though the same can be said of probable cause, which, as described above, involves examination of the "totality of the circumstances."

The doctrine of qualified immunity insulates officers' judgments from liability for damages when, in tense and rapidly evolving situations, they misjudge the placement of such fine lines. Denying the officers qualified immunity here based on a factual dispute involving seconds would be inconsistent with the Supreme Court's instruction that "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving[.]") *Graham*, 490 U.S. at 398-97 (1989). Woods-Ortiz's and Trevarthen's judgment that the slamming door indicated Terrel had just entered, though incorrect, did not transgress clearly established law.

### B.       Excessive Force—Display of Weapons

The defendants are also entitled to summary judgment on the Duprees' claim that the police used excessive force when Trevarthen briefly pointed his weapon at the family immediately after entering the apartment. The reasonableness of a use of force is assessed objectively, "judged on the basis of the conditions the officer faced." *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009). The factors to consider in assessing whether police use of force was excessive are:"1) the severity of the crime at issue, 2) whether the suspect poses an immediate threat to the safety of the officers or others, and 3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 660. "Not every push or shove, even it if may later seem unnecessary in the peace of a judge's chambers" will give rise to an excessive force claim. *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028,1033 (1973). "While police are not entitled to point their guns at citizens when there is no hint of danger, they are allowed to do so when there *is* reason to fear danger." *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009).

In *Baird*, the only authority the Duprees cite on this issue, the court denied qualified immunity to officers who rounded up and detained suspects at a workshop while pointing a submachine gun at them though they had no "suspicion that anyone at the industrial park was

18

armed or dangerous." *Id.* at 343. The crime being investigated was alteration of a vehicle identification number. The Seventh Circuit concluded that the police officer had violated clearly established law because he "pointed a submachine gun at various people when there was no suggestion of danger, either from the alleged crime that was being investigated or the people he was targeting." *Id.* at 345.

The officers' pointing of their weapons in this case does not approach the excessive force at issue in *Baird*. In Woods-Ortiz's body camera footage, the viewer sees Woods-Ortiz kick open the Duprees' door and then remain at the threshold with his weapon elevated and pointed directly ahead—not toward the family. *See* Woods-Ortiz body camera at 3:54-4:05. The Duprees are all seated on a couch to the right of the doorway. *Id.* Trevarthen entered through the breached door with his weapon raised, and can then be seen briefly turning towards the Duprees with his weapon pointed in their direction. For the next several seconds, Trevarthen's movements are obscured. Tisha Dupree testified in her deposition that as soon as the police had realized that the Duprees were not who they were looking for, they lowered their weapons, Tisha Dupree Deposition 36:13-38:9., and Wanda testified that the officers never "put any guns in anyone's faces or anyone's head." Wanda Dupree Deposition 22:23-23:1. Any threatened use of force here was momentary and was corrected once the officers realized their error.

*Baird* established that even a "hint of danger" can suffice to justify the police pointing weapons at citizens. *Baird*, 576 F.3d at 345. The plaintiffs argue that there was not even a hint of danger because "the nature of the alleged offense here did not warrant the conclusion that alleged [*sic*] offender might possibly be armed." *But see, e.g., Williams v. City of Champaign,* 524 F.3d 826, 828 (7th Cir. 2008) (it was "prudent" to approach van whose occupants had been reported to have committed several robberies even though there was no report that the robbers were armed or

that weapons were used in the robberies). True, in some circumstances, it would be unreasonable to assume that someone who committed a mere traffic violation is armed and dangerous. But recall that the officers did not actually know why Terrell led them on a car chase—they learned that only upon taking him into custody. As discussed above, they were reasonable in concluding that a person who fled in a vehicle and then on foot might pose a threat to public safety and to the police. Accordingly, they did not violate any clearly established law by briefly pointing their guns towards the Duprees while in pursuit of a suspect.

III.    **The Defendants Are Entitled to Summary Judgment as to the Duprees' Claim that Their Apartment was Unlawfully Searched.**

The defendants also seek summary judgment on the Duprees' claim that the officers twice unlawfully searched their apartment—first, by conducting a protective sweep immediately after kicking the door open, Woods-Ortiz body camera footage, 4:00-4:08, and second, by returning a few minutes later to search more thoroughly. *Id.* 7:34-9:30. The defendants argue that the plaintiffs consented in both instances. The Duprees did not respond to the argument that they consented to the searches of their apartment, though they indicate in their response to the defendants' LR 56.1 statement that they did not feel free to decline. Pl.'s Resp. to DSMF ¶¶ 48, 58.

As for the initial protective sweep, the defendants assert, and the plaintiffs do not dispute, that Wanda and Tisha Dupree responded to the officers' demands to know Terrel's whereabouts by saying "there's nobody here, you can look." Pl.'s Resp. to DSMF ¶ 48. To the extent the Duprees dispute that they consented to the first search (the plaintiffs point to Wanda Dupree's deposition testimony that she was scared when the officers entered the apartment), the defendants contend that they were entitled to conduct a protective sweep, and the Duprees did not respond to this argument. In any event, the record supports the defendant's contention that, whether or not there was consent, this initial search was a lawful protective sweep--"a quick and limited search

of premises conducted to protect the safety of police officers or others" that is justified, *inter alia*, when an officer has a "reasonable belief based on specific and articulable facts… that the area swept harbor[s] an individual posing a danger to the officer or others." *U.S. v. Starnes*, 741 F.3d 804, 807-808 (7th Cir. 2013) (quoting *Maryland v Bouie*, 494 U.S. 325, 327 (1990). Because the officers are entitled to qualified immunity for their judgment that they had probable cause to enter the Duprees' apartment, they are also entitled to qualified immunity as to the protective sweep that followed immediately after. The body camera video confirms that Trevarthen quickly looked into the back portions of the apartment and was quickly satisfied that no one other than the Duprees was present. Trevarthen's actions are consistent with the idea that he was performing a protective sweep to ensure that there were no threats to either the officers or the occupants of the apartment.

As for the second search, the body camera footage is consistent with Cletter Duprees' statement that the police asked for her permission to search, and she granted it. The Duprees do not dispute that they consented to this search. Pl.'s Resp. to DSMF ¶ 48. A few minutes after the officers kicked down the Duprees' door and Trevarthen conducted a protective sweep, an officer returned to the Duprees' apartment and asked if anyone else was present in the back rooms. Woods-Ortiz body camera at 7:34-9:30. Cletter Dupree lifted her hands up as if to indicate, consistent with her deposition testimony, that she didn't care, and said that there was no one else present (other than the family members that, by that point, were all gathered on the couch in the living room). *Id.* A few moments later, she says, "wherever you want to look, take your time and look." *Id.* at 8:03-8:05. The footage shows that the officers searched for approximately one minute through the bedrooms and bathroom.

"Consent searches are valid only if the consent was freely and voluntarily given." *Schneckloth v. Bustamante* 412 U.S. 218, 221 (1973). Deposition testimony and body camera

21

footage indicate that Cletter Dupree consented to the second search, and nothing in the record supports an inference that this consent was not freely and voluntarily given. No reasonable jury could conclude otherwise. The defendants are accordingly entitled to summary judgment on this issue. The second search did not violate the Fourth Amendment.

## IV.    Anthony Mines

Anthony Mines also claims that Woods-Ortiz unlawfully seized him and used excessive force against him during the brief contact that occurred just before Woods-Ortiz entered 4402 St. Charles St. In the body camera video, just after Woods-Ortiz exits his vehicle and starts running towards the entrance of the apartment building, Mines is visible standing behind a car with a garbage bag in his hand. Woods-Ortiz yells at him to get down on the ground and raises his weapon towards Mines. Mines immediately complied. Within one or two seconds, Woods-Ortiz realized that Mines was not his man, lowered his weapon, and kept running to the entrance of the apartment building. This entire interaction between the two lasted "approximately six seconds." DSMF ¶ 76; Woods-Ortiz body camera recording 3:31-3:37.

In *Williams v. City of Champaign*, the Seventh Circuit affirmed a grant of summary judgment for the defendants where the police officers, in pursuit of an armed robber, approached a family wrongly suspected of a recent armed robbery while pointing guns and then detained all of them for twenty minutes before realizing their error, and one of them for fifteen minutes more even after discovering the error. 524 F.3d 826, 829. If that twenty-minute seizure was reasonable, then it can hardly be said that the six second seizure here was unreasonable. Woods-Ortiz only pointed his gun at Mines for a moment, lowered it, and kept running. This was a reasonable and proportionate response given the information Woods-Ortiz had at the time: that a suspect in flight was in the vicinity of the building. Woods-Ortiz stated in a declaration that Mines was the only civilian near the building, that he "could not see where Anthony came from or where he was going"

and "could not see [Mines's] hands." Woods-Ortiz Decl. ¶¶ 6-8. As soon as he determined Mines was neither a suspect nor a threat, he lowered his weapon and moved on. Their contact was fleeting and ended almost as soon as it began. Given the rapidly evolving situation involving a suspect in flight and the uncertainty regarding the suspect's whereabouts, Anthony Mines presented a "hint of danger," *Baird*, and it was reasonable for Woods-Ortiz to point his weapon at Mines for a moment while he determined that the hint of danger was no more than that.

## V.   Officer Michelli is Entitled to Summary Judgment on all Claims

The defendants argue that Officer Michelli did not participate in any of the officers' allegedly unlawful conduct and is thus entitled to summary judgment. The plaintiffs respond that, while Michelli did not enter the apartment, he participated by providing backup to Woods-Ortiz and Trevarthen as those two forcibly entered the Dupree's apartment and swept it for the suspect. Pl.'s Resp. 9. Because the sole basis for the claim against Michelli is his providing backup for Woods-Ortiz's and Tervarthen's initial forced entry, which the Court examined and concluded was subject to qualified immunity, Michelli is also entitled to qualified immunity. The Court thus grants summary judgment as to the claims against him.

*          *          *

For the reasons discussed above, the defendants' motion for summary judgment is granted. Judgment will enter separately for the defendants.

Date: July 13, 2022

John J. Tharp, Jr.
United States District Judge